UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| UNITED STATES OF AMERICA | : |
| | : |
| v. | : |
| | : Case No. 20-cr-93-MSM |
| | : |
| RHODE ISLAND BEEF AND VEAL, INC | : |
| et al. | : |

**DEFENDANT, MICHAEL QUATTRUCCI'S MEMORANDUM
IN AID OF SENTENCING**

I. **Introduction**

This is the Defendant's (also referred to herein as "Quattrucci" or "Michael") Memorandum in Aid of Sentencing. Pursuant to the factors outlined in 18 U.S.C section 3553 and the discretion allowed to the Court by *United States v. Booker, 125 S.Ct. 738 (2005),* Counsel for Quattrucci respectfully suggests that a period of probation is more than adequate in this case to achieve the goals of sentencing – a sentence that is sufficient but not greater than necessary.

II. **Statutory and Guideline Analysis:**
   a. The Defendant entered guilty pleas before this Court to Counts 2, a violation of 21 U.S.C Section. 611(b)(6) and 21 U.S.C. Section 676 (a); and Count 3, a violation of 21 U.S.C. section 610(a) and 21 U.S.C section 676 (a). The USPO Presentence Investigative Report (PSR) accurately states the penalties for Count 2 (not more than 3 years imprisonment; up to one year of supervised release; and/or up to a $10,000 fine) and for Count 3 (not more than 3 years imprisonment; up to one year of supervised release and/or up to a $10,000 fine).
   b. Guidelines Calculation: The Defendant agrees with the Guidelines calculation within paragraph 67 of the PSR that the range of imprisonment available to the Court is 0 to 6 months and that a sentence of imprisonment is not required under the Guidelines.
   c. 18 U.S.C. section 3553: Counsel, on behalf of Quattrucci, contends that a sentence of probation and/or community service is sufficient but not greater than necessary to achieve the goals of sentencing in this case.

III. **18 U.S.C section 3553 Factors:** As this Court is aware, the so called 3553 factors advise a sentencing judge to impose a sentence that is sufficient but not greater than necessary and should utilize the factors set forth within the statute. An analysis of those factors follows:

a. *Nature and Circumstances of the Offense:* R.I. Beef and Veal (RIB&V) is what the U.S.D.A. would characterize as a "small" animal slaughter and meat processing plant located in Johnston, R.I. In 2019 when this incident occurred, Michael Quattrucci was the President of the corporation and Joel Quattrucci was the Vice President. The business entity was originally purchased by Michael's father, Alfred, along with two other partners. At that time the business was known as Johnston Dress Beef and Veal and located at its current site. Other partners were eventually bought out and the business name was changed to its current title. Alfred Quattrucci was a very involved owner and lived in an apartment on a street near the business. Michael, as he always had, worked side by side with his father. Alfred Quattrucci passed away in 2008 and Mrs. Quattrucci succeeded as the business owner. Although Mr. and Mrs. Quattrucci had lived separately for several years they never divorced. Ultimately, Michael and Joel bought the business from Mrs. Quattrucci. The business continued on with its main purpose – the slaughter of cattle and, less frequently, goats and hogs, and then the processing of meat into products for commercial customers. RIB&V also had a small meat shop attached to the building but was kept separate from the processing operation.

In providing information regarding details of the RIB&V operation Michael advised counsel that his father, Alfred, used to say that "you will find out after the first day, who can do this work". Michael offered to have his counsel observe the process at RIB&V but he respectfully declined. However, the Defendant provided sufficient detail and, along with the Inspector's report, a summary of the operation is herein provided to the Court.

The USDA provides certified Inspectors to observe and approve the slaughtering process in all meat processing facilities across the country. In RIB&V's case, they were assigned a regional inspector due to its small size. The Inspector, on average, had 4 to 5 different plants that he/she was responsible for and would rotate through these different locations. There are essentially two important parts of the slaughter observation and approval process. First, the assigned Inspector must witness the actual slaughtering of the animal and, later, will conduct a shorter visual inspection before the processed products are packaged and stamped as approved for sale.

When a shipment of cows or steers arrives at RIB&V, they usually are kept in an outside holding pen. When the Inspector arrives, he/she will routinely observe, and in some cases, examine the animals prior to slaughter. The USDA Inspector is always present during the slaughtering process. The animals are then guided, separately, through a chute and, when secured, an employee will strike the animal in the head with a USDA approved gun which consists of a long pole with a charge that triggers on contact. Usually, the cow or steer is quickly dispatched and the rest of the "kill floor team" begins the initial process of dismembering the animal. The head is removed, and the hide is pulled off and the carcass is then hooked to a diamond swing plate and the internal organs are then removed so that they can be

examined. The Inspector, who is present and dressed in a butcher's type smock, a construction hat and boots and gloves, will then closely examine the internal organs of the animal to ensure no signs of disease are present. Once this process occurs the split carcass will be affixed to two different hooks and sent to the scale. The two portions of the carcass are then weighed, and the Inspector climbs up a ladder for further inspection and will typically instruct the RIB&V employees on where to trim the two separate parts of the carcass. Once that is accomplished and the Inspector sees nothing that concerns her/him the Inspector will then yell "wash it!". Once the wash is completed the Inspector will examine the carcass parts again and will either give permission to stamp the beef or deny permission if he/she notices something suspicious. In that event, a call will likely be made to the USDA assigned Veterinarian to examine the carcass and the area of concern. If the carcass is approved, the RIB&V employees will stamp both sides of the carcass typically in three places – the hind quarters: the top of the carcass and on the T-bone. Unfortunately, due to the wet condition of the meat, the markings made at that time will sometimes fade or disappear.

The divided carcass will then be transported on hooks to a cooler that is kept at 35 degrees. Depending on the nature of the order, the divided carcass is then either "boned out" or shipped out whole with the butchering done by the customer. Usually, the meat is "broken down" by the RIB&V butchers into cuts that are typically the product that is ultimately delivered to grocery chains and restaurants. On occasion, a customer is allowed to send their own butcher to participate and oversee the cutting phase of the process.

The second part of the inspection process occurs just before butchers prepare the meat for packaging. The inspector will observe the carcasses and if the initial stamps have faded will advise RIB&V to re-stamp them. Prior to affixing a USDA stamp on a package that one typically sees on a meat product in a store, the USDA Inspector will go into the packaging area and after a usually short visual inspection will ok the stamping process. The purpose of this inspection is to ensure that there are no signs of contamination of the various cuts and that the stamps are clearly legible. Once that occurs the products are ready to be shipped to the customer.

The instant case began with the shipment of a steer to RIB&V from a long-time and valued client, Donna Macek Lesczezynski, the owner of Soetl Farm in Salem, Connecticut. Lesczyeynski sent this particular animal to be slaughtered by RIB&V and wanted the beef products shipped back to her quickly. The actual slaughtering of the steer occurred while RIB&V was not under any order of suspension and was properly observed and approved by the on-site USDA Inspector. In other words, everything up to the time of the cutting of the beef products was done according to the proper USDA protocol.

Unfortunately, on August 20, 2019, the USDA, Food Safety and Inspection Service served a notice of suspension on the business and removed the services of USDA

inspectors. The suspension was due to evidence of rodent droppings found during an inspection. Upon receiving the NOS, RIB&V began immediate cleaning operations to address this issue. In the interim, Soetl Farms kept calling and literally asking "where's the beef?" The Quattruccis now recognize that they should have contacted the USDA inspectors to explain their dilemma (the most important part of the slaughter process had already been observed and approved, but because of the suspension, they couldn't finish cutting and packaging the final product). Believing that since this was a "custom slaughter" which had been approved all the way through the process but for the final cutting, packaging, and stamping, very poor judgment was exercised at this point to accommodate the customer.

On August 28th Inspector Garvey made an unannounced inspection of the business premises and found two workers stamping the packaged products from Soetl Farm without approval. The next day, USDA Investigator, John Augustine came to the plant to take photos and question the owners and employees. Michael Quattrucci was immediately cooperative, explained what had occurred, agreed to destroy all of the beef products and provided Augustine with a written statement. Restitution was also made to Soetl Farms and Ms. Lesczczynski. To this day, Ms. Lesczcyznski still sends steers and cows to RIB&V to be slaughtered and processed.

What clearly exacerbated this situation was a visit to the property made by Inspector Garvey on September 5, 2020, when he observed cutting and stamping occurring without an inspector present. The suspension of August 20th had essentially been lifted, or held in abeyance, as of September 4, 2020. However, due to cutting and stamping occurring without an inspector on premise, Garvey immediately stopped the activity and isolated ten beef carcasses and twenty pounds of beef packages that had not been approved for final stamping. In all, RIB&V agreed to destroy over 1000 pounds of beef carcasses and products. All effected customers were made financially whole by the Company. Michael Quattrucci was not on premise on September 5th and was unaware that this activity was occurring but recognizes that after the August 28th incident he and management had a legal duty to ensure that all USDA regulations were being followed.

b. *History and Characteristics of the Defendant*: Michael Quattrucci is currently 61 years old and resides at 26 Morton Avenue in Johnston, R.I. He has been married to his wife, Loretta, for approximately twenty years and they live in a one family home with Loretta's son, his wife and children. Loretta reported that her son treats Michael as a father and the children look at him as their grandfather. His marriage is solid, and he is clearly devoted to his family.

The Defendant was raised in Seekonk Massachusetts on a family farm and was drawn to agricultural work from an early age. He has seven siblings and is roughly in the middle. While he has more contact with some of his brothers and sisters he has described, overall, a good relationship with all of his siblings. He is probably closest to his twin brother, Donald, who is a successful financial manager and lives

in Florida. Quattrucci's mother, Theresa, is now 90 years old and resides in Coventry with her son, Glenn. However, Michael has a close relationship with Theresa and visits her on a regular basis. The Defendant admits that he was affected by his mother and father's separation as he was close with both of his parents.

Michael took to farming and indicated that he began working at the family farm from the age of eight. Part of the farming operation involved buying and selling cows, lambs, and goats for resale to other farmers or to slaughterhouses. Alfred Quattrucci ultimately believed that small farming in New England was not going in a profitable direction and he, along with two other partners bought Johnston Dress Beef and Veal. Michael went along with Alfred to work at the facility. Eventually, Alfred bought out his two partners and owned the business outright. Michael continued working at what was later renamed Rhode Island Beef and Veal. He has described it as arduous but rewarding work. He primarily worked on the "killing floor" but he also would enter the cooler and the packaging area to supervise activities that were going on there. The interior of the building was often messy and cold. The average temperature on the floor was approximately 50 to 60 degrees and the cooler averaged 35 degrees. Over time he also learned the front end of the business from his father which included customer service, billing, and collecting.

The only member of the extended Quattrucci family that appeared to be interested in the business was Michael's nephew and Alfred's grandson, Joel Quattrucci. He eventually came to work at RIB&V and when Alfred died in 2008, he joined with his uncle, Michael, to purchase the business from Theresa Quattrucci. Joel Quattrucci also learned the business over time but was more drawn to the front end of the operation. As a result of this disposition, Joel will now own the business and continue with its operation under USDA supervision. Unfortunately, Michael, by agreeing to plead guilty in this case, has had to divest himself of his ownership in the business that he helped to build.

As the Court knows, RIB&V, Michael Quattrucci and Joel Quattrucci were indicted by the Grand Jury for violations of the Federal Meat Inspection Act of 1906, 21 U.S.C sections 610 and 611. Initially, after consultation with the US Attorney's Office for the District of Rhode Island, (USAO) it was felt that this counsel did not have a conflict representing both of the individual defendants and the corporate defendant. A *Foster hearing* was subsequently held before U.S. Magistrate Judge Sullivan, and she was satisfied that the defendants were aware of the consequences of their decision and waived any conflict if one could be found to exist. That situation changed after the Assistant US Attorney spoke with USDA counsel in Washington D.C. After that consultation, Defendant's counsel was advised that the Government would allow one Defendant to plead to two felonies along with the corporation and the charges would be dismissed against the other Defendant. This was largely due to the fact that all parties (the USAO, the USDA, and Defendant's

    counsel) wanted the business to survive with certain agreed conditions. The AUSA left it up to the Defendants as to who would step forward and plead. Without hesitation Michael Quattrucci indicated that he would be that person. He felt responsible and accountable for what had occurred, but he also wanted to save the business that he and his father had spent years building even if it required him to divest his interest in the business. This resolution would allow Joel Quattrucci to continue to own the business and operate it under a consent order with the USDA which will likely be finalized upon conclusion of this matter before the Court.

    In the time that this counsel has gotten to know Michael Quattrucci, through conversations with him and members of his family, he is clearly a person of unusual humility and has a demonstrated concern for other people. One can observe this in the way he has dealt with this case; the way he embraces his family and honors his father's memory; and the way he assists his church. This is not a self-centered person. Unfortunately, there are not that many people around today who possess these qualities and live a humble and simple life.

c. *Seriousness of the offense, respect for the law and just punishment:* The Defendant knows that his life history does not wipe away what happened in this case. He understands the seriousness of putting perishable food products in the marketplace without proper USDA approval. He also understands that someone had to be held accountable and he has stepped forward. His life history, his acceptance of responsibility and remorse for this offense addresses the seriousness of the offense and respect for the law. He acknowledged this when he cooperated with the USDA investigation from its start. His actions militate toward a sentence that does not include incarceration. Respectfully, a prison sentence is not called for here as this Defendant has already suffered the sting of being a convicted felon who has lost his business. A short period of probation and community service would be more than adequate to satisfy the goals of fair sentencing.

    Furthermore, RIB&V, through its management, has agreed to a consent order with the USDA which, at this juncture, will include assignment of a monitor to supervise its operations; an ethics training program to educate ownership and all employees about the USDA regulations, pertinent statutes and what occurred in this case. RIB&V also has agreed to the assignment of an ethics officer who already has been selected. She is a long-time and valued employee and will very likely be named an officer of the corporation. The final details of the consent order will be worked out with USDA's counsel in Washington D.C. at the conclusion of these proceedings.

d. *The deterrence factor and protection from future crimes:* RIB&V has already suffered negative publicity as a result of this indictment and the guilty pleas entered by Quattrucci and RIB&V. The sentencing in this case will certainly be described by the media and in DOJ and USDA publications and will serve as a necessary deterrent to any third parties that might consider cutting corners in this industry or any business that deals in food products. Other resolutions of similar cases by DOJ

and USDA are scarce and usually involved more serious allegations involving fraud and false statements and, for larger corporations, typically resulted in large fines with few individual prison sentences. Michael Quattrucci is for all intents and purposes out of the business that he has been involved in virtually his whole working life. The likelihood of his reoffending is very likely zero.

e. *The need for treatment and training:* This is largely a non-factor in this case. The only treatment the Defendant needs is ongoing medical treatment as described in the PSR. Mr. Quattrucci is clearly not in good health. He is currently scheduled to undergo a heart procedure within the next two weeks as ordered by his physicians.

f. *The kind of sentences available and the sentencing ranges:* The PSR adequately describes the sentences available to the Court in this case. As counsel has indicated to the Court and by the PSR, a jail term is not a required sentence in this case. A short period of probation and community service would adequately serve the ends of justice. According to the character letters submitted to the Court, Quattrucci is a person who has consistently performed community service on his own and would be eager to assist his Church or another non-profit organization.

g. *Need to avoid disparity in sentencing:* Counsel again believes that the PSR has addressed this issue. The court has the ability under the USSG to impose a sentence of probation even without examining the *Booker* factors. However, a sentence of probation and community service would be sufficient here and would serve as a fair and just sentence.

IV. **Conclusion:** The Court has before it a good man who was responsible, perhaps not entirely, for mistakes that were made in his business that constituted violations of the law. He cooperated with the USDA when its investigator Augustine first started his investigation on August 29, 2019. He stepped forward and pled guilty and accepted responsibility because he felt it was the right thing to do and to save his family business and the jobs of his employees. A sentence of probation would be more than adequate in this case.

Respectfully submitted,

MICHAEL QUATTRUCCI and RHODE ISLAND, BEEF AND VEAL, INC.

By their Attorney,

PANNONE LOPES DEVEREAUX & O'GARA LLC

*/s/ William P. Devereaux*
William P. Devereaux (#2241)
PANNONE LOPES DEVEREAUX & O'GARA LLC
1301 Atwood Avenue, Suite 215 N
Johnston, RI 02919
(401) 824-5100
(401) 824-5123 (fax)
wdevereaux@pldolaw.com

**CERTIFICATION**

I hereby certify that on the 24th day of July 2023, this document was filed electronically and is available for reviewing and downloading by the ECF registered counsel of record:

*/s/William P. Devereaux*

8